Case number 3720301. The people of the state of Illinois. Appellee by Justin Nicolosi v. Orlando Mathews. Appellant by Stephen Burrell. Mr. Burrell. Firearm ready. Okay. Good afternoon, Your Honors. Counsel. I'm Steve Burrell with the Office of the State Appellate Defender, their district, for the defendant appellant, Orlando Mathews. May it please the Court, I'd like to note for Your Honors and the record that my client's parents are here with us today. I first want to note that the situation we have here is we've got a case where the record shows that multiple witnesses would have said that two men with dreadlock hair committed the offense in this case. It's in the spirit that my client did not have dreadlock hair and did not meet the description that those witnesses provided. Therefore, it seems highly likely that my client is in fact innocent of the murder charges that he was convicted of in this case. That said, today I'd like to move to the issues regarding suppression of evidence that I raised in issues three and four and focus mostly on those. But I'd be happy to take questions from Your Honors on any of the six issues that I raised in the briefs today. As to issues three and four, it's undisputed in this case the trial court found and the State has conceded that officers illegally entered the apartment in which my client was staying without a warrant and without consent. The State has further agreed, conceded in this appeal, that while they were inside, after that illegal entry, they illegally arrested my client without probable cause. So the only question at issue in the issues three and four that I've raised in this brief is whether there's an exception to the exclusionary rule that applies to allow certain evidence that's contested to be admitted in this case. Issue three pertains to firearms that were discovered inside the apartment. The State argues that those firearms were properly admitted under the independent source exception to the exclusionary rule. And the State's argument goes, essentially, the State has agreed that once officers illegally entered the apartment, everything that they saw at that point, any searches that took place at that point, when they were initially been in there after the illegal entry, that is all tainted and could not be used. So... Was this the defendant's apartment? There was testimony that he was staying there. It was actually his girlfriend's apartment, but he had been staying there. Does that make a difference? No, it doesn't make a difference. The only reason that it could be relevant is a question of standing. And the trial judge specifically found that there was standing for Orlando Matthews to challenge the illegal entry and arrest in this case. Because of living with a girlfriend. Yes. So what happened is after officers were inside, that information they got was tainted. But subsequently, they went and got a warrant, which included both tainted information learned from the illegal entry and untainted information learned before the entry. And the State argues that the untainted information would have been sufficient to make the showing of probable cause required for the warrant issue. And that officers would have gotten the warrant without the information they learned through the illegal entry. And those are the two prongs of the independent source doctrine. It's the State's burden to prove both prongs of that doctrine. Courts have said that it's an onerous burden, and it should be, because we're talking about illegal conduct and just a narrow exception to the exclusionary rule. In this case, the untainted evidence in the warrant showed that there were footprints leading from the area where Justin Thompson, the victim's body, was found, toward the multi-unit apartment building at 729 Hightower. Officers, when they got there, they decided to canvass the building, so they randomly started knocking on every door in this apartment complex. When they did so, they encountered my client's girlfriend, Aries Morris. And that wasn't the first time they had encountered her that evening, was it? No. And for this particular part of the issue, in terms of the issue 3A, we're really just looking at what the warrant says. But the warrant mentioned a prior encounter. The warrant did not really provide much detail at all about the prior encounter. So a judge who's looking at that would see that there's a prior encounter and that she was told, essentially, what police were doing. But it doesn't say much else about her demeanor at that prior encounter. None of that information can be considered when we're looking at just the warrant. The parts that the state proved was untainted. So all we know is that it was a prior encounter, and she gets an idea about what was going on. So she enters the door. She appears nervous. She opens the door about six to eight inches. Officers ask her if anybody else is there. She says, initially, that only her kids are there. Once she opens the door a little bit further, officers observe a black man sitting on a couch. The complaint does not say that that man met the description of the two suspects, nor could it, because Orlando Matthews decided that he did not meet the description of the two suspects in this offense. So all we've got is someone who's nervous at the door and fails to mention that there's a black man present there who does not meet the description of the perpetrators. That is not sufficient to warrant a person of reasonable caution to believe that evidence of murder or unlawful possession of a weapon by felon, which is what the warrant was for, would be discovered in this particular apartment unit. At best, it establishes a mere hunch or generalized suspicion, not probable cause. Therefore, the trial court erred when it denied counsel's motion to suppress the firearms because the independent source doctrine does not apply. The second prong, it does not apply. I've also argued that the state failed to meet the first prong because the state did not elicit any evidence from any of the officers that they would have sought a warrant based on this bare-bones information. And, in fact, we've got testimony about when officers decided to get the warrant. It was after they had come into the apartment and observed two different men in dreadlock hair, with dreadlock long dreadlock hair, one of them attempting to flush a shell casing down a toilet. That's when they decided to go try and get a warrant. So the state simply failed to meet its burden to show that officers were even attempted to get a warrant based on this information. Therefore, that's another reason to find that the evidence should have been suppressed under the first prong of the independent source doctrine. Let me ask you this. Criminals usually, if some criminal's committed a crime, and they're trying to find a way to hide from the police, and sometimes they go to a place where they're welcome, and sometimes they go to places where they are not welcome. Knock on the door, somebody answers, and they force their way in and hold people hostage until things cool down and they think they can get out of there. That occurs. So the fact that these officers testified that they saw this woman, and she was calm, their first contact. Then they go to the door, and she's very nervous and says, Maybe I'm just here with my kids, and they can see at least one male in there. They don't know if there's others. Maybe they don't know it's a girlfriend. Maybe the murderers came in here and are holding her, and that's why I said that she's nervous now and she wasn't earlier. And for her good and her protection, find out something's just not right here. And under these circumstances, there's been a shooting. Maybe the shooters are in there. What's not reasonable about that? Well, the first point that I'd like to make is that the warrant did not say anything about Ares and Marks being calm the first time they spoke. That information cannot be considered at all because it's not in the warrant. The state is limited to the information in the warrant that it proved was untainted. So there's nothing in there that says that she was originally calm in their conversation. It says that they had a conversation. It didn't say anything about her demeanor. That information cannot be considered in any way when addressing Issue 3A. So there's no information about a change of demeanor. That's image information at the suppression hearing, which can only be considered with respect to my claims of ineffective assistance to counsel, not with respect to the preservative to you, which is limited to the warrant. So taking that information out, all we have is a hunch. There needs to be more than that. There's not enough for a person under reasonable caution to believe that murder, evidence of a murder, would be found inside an apartment just because someone is nervous and they see someone who does not meet the description there. There are many reasons. The fact that she's nervous could be a reason that she just misstated that only her kids were there. There are many explanations for that. How many adult males were in that apartment? Three. So you think that was just a misstatement? Well, again, we have to look at what the officers knew according to what the warrant states at the time. The fact that there were other people there is something that was not known. The state has agreed to that. The judge agreed to that. We have the judge's findings here. The judge clearly agreed that the entry was illegal, and the judge stated what he relied upon essentially in finding that the independent source rule applied, but that simply was not enough. There was no knowledge that there were other people besides this one man who did not meet the description in the apartment at that time. And, again, none of this in the end matters if we look at my Issue 3B argument, because if the officers would not have got a warrant, if they would not have applied for a warrant, it doesn't matter whether they had probable cause. They can have all the probable cause in the world, and according to the case law that I said in my brief, that doesn't matter. I cited two cases where there was, in fact, probable cause, clearly probable cause for officers to get a warrant, but it didn't matter because there was no evidence that they would have gotten the warrant based on that. And here it seems that officers did not think that they had enough for a warrant. They only went and got a warrant later. They included all the tainted information in the warrant, which suggests that they believed that they needed that to show probable cause. Officer Sinks actually testified he did not decide to get a warrant at any point before he entered the apartment, essentially, and Officer Curry later testified that he got a warrant after he went in there and found the other two guys with dreadlock hair. Therefore, under Issue 3B, what were they doing? Mr. Simmons was attempting to flush. Destroy evidence. Yes. Yes. Again, that's something, though, the officers did not know and cannot come into play with respect to our considerations as to Issue 3, except to show that that was when officers realized they had probable cause and not before that. This court could also reverse for the reasons that I've argued in Issue 4. The State, as I mentioned, has conceded that Matthews was illegally arrested, Orlando Matthews was illegally arrested inside the apartment without probable cause. And so the only issue that the State has raised is that the attenuation exception to the exclusionary rule should apply. However, the State has not argued that there are any intervening circumstances. Officers could not have developed intervening probable cause in this case because the State agrees that all the information after the entry was tainted by the illegal entry and cannot be used to establish probable cause to arrest Matthews. Of course, none of that information was actually particularized to Matthews anyway. It gave them suspicion to arrest the two guys with dreadlock hair who almost certainly committed this offense instead of Matthews, who was most likely innocent of this offense. But ultimately, there could be no intervening probable cause because none of that tainted information could be used. And the gunshot residue test that is at issue here and the video of the gunshot residue test showing Matthews wiping his hands on his pants, those things were completed before officers got the warrant. So absent there being probable cause, the State cannot establish the attenuation exception in this case. The State argues about the flagrancy of officer misconduct. It's not necessary for this Court to reach that because that doesn't matter in the end with the other two factors against the State. However, if this Court does, it should be noted that the officers knew when they arrested Matthews that he did not meet the description of the suspects, and they knew that they arrested two people with dreadlock hair who almost certainly were the ones who committed this offense. And they basically arrested someone who, by all appearances at that point, was innocent of any crime. What purpose could there be other than to try and obtain evidence that they did not have against him, which is an illicit purpose? Therefore, if this Court does not reverse for Issue 3, it should reverse for the reasons argued in Issue 4 and suppress the conviction and remand the case for the State to decide whether it wants to pursue a new trial without the gunshot residue attest or the video of the gunshot residue attest, as argued in Issue 4, and or without the firearms, as argued in Issue 3. And that's all I have, unless Your Honors have any questions at this point. All right. Thank you, Mr. Burrell. Thank you, Your Honors. Mr. Nicholos. Good afternoon, Your Honors. May it please the Court, Counsel, Your Honors, at this time, the State would stand on its brief. If there are any questions the Court would like to answer, I would answer them, if there are any. Thank you. Well, I guess there's nothing to rebut. If you've got anything else to say, I'll let you say it. Okay. All right. Well, good. Well, thank you both for your visit here today. Thank you for your argument and your short visit, Mr. Nicholos. This matter will be taken under advisement. A written disposition will be issued. And right now, I guess, we'll be in recess until 9 in the morning.